BERCH, Justice,
dissenting.
¶ 43 I respectfully dissent.
¶44 The question before this court is whether a state statute is unconstitutional. In deciding such questions, we usually indulge the presumption that state statutes are constitutional, see Republic Inv. Fund I v. Town of Surprise, 166 Ariz. 143, 148, 800 P.2d 1251, 1256 (1990), and construe ambiguous statutes, if possible, so as to harmonize them with the constitution. Schecter v. Killingsworth, 93 Ariz. 273, 282, 380 P.2d 136, 142 (1963).
¶ 45 The statute at issue here has not been construed by the courts of this State. The majority opinion assumes that the conditions listed in ¶ 4 of this opinion, if left untreated for the duration of a pregnancy, will not jeopardize the mother’s life, and therefore abortion procedures to terminate the pregnancies that impede treatment for those conditions would not be covered by AHCCCS. It seems clear to me that, if confronted by specific fact situations, the court may well find several of the procedures covered, specifically in those situations in which failure to treat the condition jeopardizes the mother’s life, even if not immediately.[1] If this question is in doubt, this court should refrain from engaging in a constitutional adjudication on this less than fully developed record.
¶ 46 Even assuming, however, that the statute would not allow funding for abortions to allow treatment for some of the conditions referenced in ¶ 4, I have still another point of divergence with the majority position: The question before us has been resolved by the United States Supreme Court, as respects the federal constitutional claims, in a manner adverse to Plaintiffs’ position. Thus, unless the Arizona Constitution compels payment for the abortion procedures in question, the State need not fund them. The majority concludes that the Arizona Constitution does compel the State to fund this medical procedure. I do not agree.
¶47 Because Arizona courts have always followed the United States Supreme Court’s equal protection and due process analysis,[2] the court of appeals relied upon that Court’s analyses in Harris and Maher of issues similar to the one now before us. In Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671 (1980), the Court held that a federal statute prohibiting states from using federal funds for abortions, except to protect the life of the mother and in cases of rape or incest, did not violate any federal constitutional right. It concluded that a woman’s right to choose to undergo an abortion “did not translate into a [federal] constitutional obligation of [the State] to subsidize abortions.” Id. at 315, 100 S.Ct. 2671. The Court distinguished “between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy,” noting that “[c]onstitutional concerns *465 are greatest when the State attempts to impose its will by force of law; the State’s power to encourage actions deemed to be in the public interest is necessarily far broader.” Maher v. Roe, 432 U.S. 464, 475-76, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (emphasis added). Thus, the federal constitution requires that while a state may not interfere with a woman’s right to choose to have an abortion, it need not fund abortions.
¶ 48 The Court reasoned as follows in upholding a funding prohibition similar to Arizona’s:
[I]t simply does not follow that a woman’s freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices. The reason why was explained in Maher [v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977)]: although government may not place obstacles in the path of a woman’s exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman’s ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency. Although Congress has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all. We are thus not persuaded that the Hyde Amendment impinges on the constitutionally protected freedom of choice recognized in Wade.
Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom. To hold otherwise would mark a drastic change in our understanding of the Constitution. It cannot be that because government may not prohibit the use of contraceptives, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, or prevent parents from sending their child to a private school, Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, government, therefore, has an affirmative constitutional obligation to ensure that all persons have the financial resources to obtain contraceptives or send their children to private schools. To translate the limitation on governmental power implicit in the Due Process Clause into an affirmative funding obligation would require Congress to subsidize the medically necessary abortion of an indigent woman even if Congress had not enacted a Medicaid program to subsidize other medically necessary services. Nothing in the Due Process Clause supports such an extraordinary result. Whether freedom of choice that is constitutionally protected warrants federal subsidization is a question for Congress to answer, not a matter of constitutional entitlement. Accordingly, we conclude that the Hyde Amendment does not impinge on the due process liberty recognized in Wade.
Harris, 448 U.S. at 316-18, 100 S.Ct. 2671 (footnotes omitted).[3]
¶ 49 The United States Supreme Court has also analyzed whether the constitutional right to choose entitled women to Medicaid payments for abortions that were not medically necessary. Maher, 432 U.S. at 464, 97 S.Ct. 2376. In holding that it did not, the Court explained that the abortion right recognized in Roe v. Wade and its progeny did not prevent the State from making a “value judgment favoring childbirth over abortion, and ... implementing] that judgment by the allocation of public funds.” 432 U.S. at 474, 97 S.Ct. 2376. The Court reasoned that
*466 [t]he Connecticut regulation places no obstacles — absolute or otherwise — in the pregnant woman’s path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut’s decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman’s decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult — and in some cases, perhaps, impossible — for some women to have abortions is neither created nor in any way affected by the Connecticut regulation.

Id.

¶ 50 In sum, the Supreme Court has concluded that (1) neither the Due Process Clause nor the Equal Protection Clause requires states to fund abortions, and (2) whether to do so is a policy choice appropriately left to the states. Therefore, if there is to be any state payment for therapeutic abortions for indigent women in Arizona, the right to such payment must derive from the vote of the Arizona legislature or be compelled by the constitution of this State. The Arizona legislature has chosen not to fund abortions that are not necessary to save the life of the mother, see A.R.S. § 35-196.02, leaving for decision only whether the Arizona Constitution requires payment for medically necessary abortions.
¶51 The majority concludes that it does. That obligation, according to the majority, emanates from a fundamental duty under the Equal Privileges and Immunities Clause to have the State act in a neutral manner with respect to providing medical treatment. See id. ¶ 14. Yet despite the acknowledged fundamental nature of the federal right to choose, the Supreme Court scrutinized statutes affecting abortion funding only to determine whether they had a rational basis, finding the classifications at issue in such an analysis — gender and wealth — not suspect categories. See Harris, 448 U.S. at 322-23, 100 S.Ct. 2671; Maher, 432 U.S. at 470, 97 S.Ct. 2376. This court, however, has chosen to apply the strict scrutiny test to this funding decision. Construing Arizona’s Privileges and Immunities Clause in a manner at odds with the traditional analysis, which has always been to interpret “the equal protection clauses of the Fourteenth Amendment and the state constitution” in similar fashion, constitutes a dramatic departure from prior Arizona case law. See Glover, 62 Ariz. at 554, 159 P.2d at 299; Martin, 195 Ariz. at 313, ¶ 62, 987 P.2d at 799. Calling the right to neutral funding fundamental, the majority of necessity applies the strict scrutiny test, which precipitates the finding of uneonstitutionality. To narrow the question to the funding of abortion, as the Supreme Court has done, reveals that the pivotal question— funding, not choice — has never been defined as fundamental and therefore the applicable standard of review is not strict scrutiny, but rather the rational basis standard. The statute meets that standard.
¶ 52 The Arizona legislature has the power to enact policy and funding laws for the general welfare. See McKinley v. Reilly, 96 Ariz. 176, 179, 393 P.2d 268, 270 (1964); State v. Harold, 74 Ariz. 210, 216, 246 P.2d 178, 181 (1952). This power encompasses the right to draw lines regarding funding. We must therefore presume that the legislature has determined that the public’s safety, health, or moral well being is best served by not prohibiting or restricting — but not funding— abortions unless necessary to save the life of the mother.[4] This is the type of policy choice routinely entrusted to the legislature and, unless the choice is unlawful or unconstitutional, our jurisprudence and notions of separation of powers require that we defer to the legislature’s choice. See Republic Inv. Fund I, 166 Ariz. at 147-48, 800 P.2d at 1255-56; Harold, 74 Ariz. at 216, 246 P.2d at 181. If *467 the public disagrees with the choices of its elected representatives, its recourse is to turn those representatives out of office. It is not for this court to make such policy decisions.
¶53 In enacting A.R.S. § 35-196.02, the legislature was undoubtedly aware of the Supreme Court’s holding that a woman has a fundamental right in the first trimester of pregnancy to choose to abort a fetus, Roe v. Wade, 410 U.S. at 113, 93 S.Ct. 705, unhampered by “interference from the State.” Planned Parenthood of Central Mo. v. Danforth, 428 U.S. 52, 61, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (citing Roe v. Wade, 410 U.S. at 164, 93 S.Ct. 705). It was probably also aware that the Court had recognized, in this contentious policy area, the State’s “important and legitimate interest in ... the potentiality of human life,” Planned Parenthood v. Casey, 505 U.S. 833, 875-76, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (quoting Roe v. Wade, 410 U.S. at 162, 93 S.Ct. 705), at all stages of development. Id. at 876, 112 S.Ct. 2791 (O’Connor, Kennedy, and Souter, JJ.); 944 (Rehnquist, C.J., joined by White, Scalia, and Thomas, JJ., concurring in the judgment in part and dissenting in part). This court’s analysis minimizes the State’s interest in potential human life and ignores the fact that abortion differs in a profound way from other kinds of medical treatment. In no other “treatment” is a potential life terminated. Thus, the State has a heightened interest in protecting life that the majority dismisses too lightly.[5]
¶ 54 I have a final concern: Generally, when a court finds a statute unconstitutional, it strikes the offending provision, clause, or word. In this ease, however, the court has taken the liberty of simply rewriting the statute, substituting the word “health” for the legislature’s chosen term, “life.” This court has cautioned others against construing “the words of a statute to mean something other than what they plainly state.” Canon School Dist. No. 50 v. W.E.S. Constr. Co., 177 Ariz. 526, 529, 869 P.2d 500, 503 (1994). We should follow our own admonition. “Life” is plainly stated and has an ascertainable meaning, one that differs from “health.” This court has also previously warned that “[i]t is only where there is no doubt as to the intention of those who frame [a] ... statute that a court may modify, alter or supply words that will ... permit ‘particular provisions’ to be read or construed otherwise than ‘according to their literal meaning.’ ” Id. (quoting Bd. of Supervisors v. Pratt, 47 Ariz. 536, 542-43, 57 P.2d 1220, 1223 (1936) (citations omitted)). That is not the case here. The alteration by this court amends the statute to mean something clearly not intended by the legislature.
¶ 55 In sum, I see nothing in the Arizona Constitution that provides greater protection for a woman’s right to choose abortion than is provided by the federal constitution, nor do I see any provision compelling payment for the procedure. Whatever one may think of the merits of the statute at issue, it embodies the type of policy choice that is routinely entrusted to the legislature, an elected body, to make. It is not the province of the court to substitute its judgment for that of the public’s elected representatives.
¶56 I would affirm the judgment of the court of appeals.
CONCURRING: CHARLES E. JONES, Chief Justice.

. This case was brought by health care providers, rather than by any woman whose decision to abort might have been affected by the state law at issue. Thus, while the record contains unspecific claims of AHCCCS denials of requests to pay for abortions, no claims of improper denial have been brought before the courts of this State and there are no concrete facts for adjudication presented in this case. I also note that the statute at issue was passed in 1980 and wonder why the nineteen-year delay in bringing suit.

. See Valley Nat'l Bank v. Glover, 62 Ariz. 538, 554, 159 P.2d 292, 299 (1945) (observing that state and federal equal protection clauses "have for all practical purposes the same effect”); Martin v. Reinstein, 195 Ariz. 293, 313, ¶ 62, 987 P.2d 779, 799 (App.1999) (finding "no difference in underlying rationale that would militate in favor of interpreting the Arizona Equal Privileges and Immunities Clause differently from its federal counterpart”); see also State v. Melendez, 172 Ariz. 68, 71, 834 P.2d 154, 157 (1992) ("The touchstone of due process under both the Arizona and federal constitutions is fundamental fairness.”); Martin, 195 Ariz. at 316, ¶ 76, 987 P.2d at 802 (finding "no support for the proposition that the Arizona Constitution provides greater [due process] protection than the United States Constitution”).

. The majority finds it “difficult to reconcile [Harris ] with the basic teaching of Roe v. Wade.” Supra n. 3. Yet Harris was decided seven years after Roe and while the Supreme Court has continued to decide abortion cases, it has not overruled or questioned the holdings of Harris or Maher.

. On the limited record before us, we cannot know whether the AHCCCS program contains other exceptions to funding of which we are now unaware, such as limiting care of potentially non-eligible individuals to "emergency care,” or precluding experimental, risky, or greatly expensive procedures. The newly discovered fundamental right to have the State fund chosen medical procedures in a neutral manner through AHCCCS may well call these exceptions into question and require funding for greatly expanded medical care for indigent Arizonans.

. The majority criticizes the legislature for acting inconsistently in protecting fetal life because it allows payment for abortions to terminate pregnancies resulting from rape or incest. Op. at ¶ 24. The record reflects, however, that the rape and incest exception is embodied in an administrative definition of "medical necessity." It is not found in A.R.S. § 35-196.02. While that exception may be necessary to comply with requirements for federal reimbursement, it appears to violate Arizona law. See Pub. Law 106-554, §§ 508-09, 3 USCCAN (2000) at Stat. 2763A-70 (requiring states to provide the benefits authorized by federal law in order to qualify for federal funds). But cf. A.R.S. § 35-196.02 (allowing state funding of abortions only to save the life of the mother); KAET v. Ariz. State Pers. Bd., 195 Ariz. 173, 175, ¶ 9, 985 P.2d 1032, 1034 (1999) (holding that agency powers are limited by the agency’s enabling legislation; agency rule that conflicts with a statute must yield).