[Civil No. 3758.   Filed May 18, 1936.]

[57 Pac. (2d) 1220.]

THE BOARD OF SUPERVISORS OF MARICOPA COUNTY, ARIZONA, Composed of C. W. Peterson, George Frye and John A. Foote, Appellants, v. M. G. PRATT, Appellee.

Mr. Harry Johnson, County Attorney, and Mr. E. G. Frazier, Deputy County Attorney, for Appellants.

Mr. Arthur T. La Prade, for Appellee.

McALISTER, J.—This is an action in *mandamus* brought by M. G. Pratt against the board of supervisors of Maricopa county in which he seeks to compel that body to redistrict the county of Maricopa for legislative purposes, pursuant to section 1, part 2, of article 4 of the Constitution of Arizona, as amended in 1932. The alternative writ was issued and the respondents by way of return filed a general demurrer and an answer to the petition. After due consideration the court overruled the demurrer and, it having been stipulated by the parties that the matter be submitted both as to law and fact upon the pleadings and argument, judgment was rendered making the alternative writ peremptory, and it is from this order and judgment that the respondents appeal.

There are six assignments but they are each directed to the one proposition involved and that is whether, as a result of the election in 1934, it is the duty of the board of supervisors to redistrict the county of Maricopa for legislative purposes. The cor-

rect answer to this inquiry depends upon the meaning of the constitutional provision referred to, the pertinent parts of which read as follows:

"There shall be elected from each county at large the number of senators to which such county is entitled,. and there shall be elected from each county, in the manner hereinafter directed, one representative for each 2,500 votes, or major fraction thereof, cast in such county for the office of governor at the last preceding general election, to be determined from the official canvass of all votes cast in all counties for such office of governor; and provided that each county shall be entitled to have one representative and no county shall have a less number of representatives than it would otherwise be entitled to if the number thereof should be computed in the manner set forth upon the total vote cast in such county for the office of governor at the general election held in the year 1930.

"Within twelve months from the time this amendment is declared adopted, the Board of Supervisors of each county entitled to more than one representative shall divide such county into as many legislative districts as there may be representatives to be elected from such county, and each district shall be entitled to elect one representative. Such division shall be so made that the legislative districts within a county shall contain, as nearly as may be, the same voting population. Such districts shall be compact in form, and no such district shall include non-contiguous portions of any county. Before establishing such district, the Board of Supervisors shall give at least thirty days' notice of their intention so to do, by publishing the same in two successive issues of some newspaper of general circulation published in such county. The order of the Board of Supervisors establishing such districts shall clearly and explicitly define the boundaries thereof, and shall be entered at large on the official records of the proceedings of such Board.

"Any such county shall be redistricted by such Board of Supervisors not less than six months prior

to each regular election for representatives, when by reason of the number of votes therein cast for the office of governor at the last preceding general election, it shall be entitled to a greater number of representatives. In counties entitled to but one representative, such representative shall be elected from the county at large.''

The facts which give rise to this controversy are these: At the general election in November, 1932, Maricopa county cast 44,749 votes for the office of Governor, and on the 5th day of January, 1934, the board of supervisors, pursuant to the foregoing amendment, divided the county into eighteen legislative districts based on that vote, and this number of Representatives was elected from the county at the general election that year. However, the county cast at that election only 38,111 votes for the office of Governor, 6,638 fewer than in 1932, and in March, 1936, the petitioner requested the board of supervisors to divide the county into fifteen legislative districts, this being the number of Representatives it would be entitled to on a basis of the 1934 vote. The board declined to redistrict, claiming that under the foregoing amendment this duty rests on it only when the county is entitled to a greater number of Representatives than it already has, and the petitioner, believing it to be its duty to redistrict also when the vote at the preceding election entitles the county to fewer Representatives, brought this action to compel it to redistrict, using the 1934 vote as a basis.

 ■ It will be observed that following the statement that there shall be elected from each county at large the number of Senators to which each county is entitled, these having been set out in the preceding language of the section as nineteen, the first paragraph of the foregoing excerpt provides that there shall be elected from each county one Representative

for each 2,500 votes, or major fraction thereof, cast in such county for the office of Governor at the last preceding general election. It will be noted also that this general statement does not stand alone but is qualified by the proviso following it which gives to each county at least one Representative and then fixes a number below which those in any county having more than one Representative shall not fall, and the number it selects for this purpose is the one to which it would be entitled under the vote cast for the office of Governor at the general election in 1930, when computed as therein set forth, that is, one Representative for each 2,500 votes, or major fraction thereof. While it was clearly the purpose of the framers and supporters of this amendment that every county entitled to more than one Representative should have one for each 2,500 votes, or major fraction thereof, etc., it was also their intention that no county should have fewer Representatives than its 1930 vote would entitle it, and this is true even though its 1932 vote, upon which the original districts were to be based, had fallen far below that.

█ The second paragraph of this excerpt sets out in minute detail when and how the various boards of supervisors shall redistrict their respective counties for legislative purposes the first time this is done under the amendment, and then follows a third paragraph providing when counties shall be redistricted in the future. It reads:

"Any such county shall be redistricted by such Board of Supervisors not less than six months prior to each regular election for representatives, when by reason of the number of votes therein cast for the office of governor at the last preceding general election, it shall be entitled to a greater number of representatives. In counties entitled to but one rep-

resentative, such representative shall be elected from the county at large.''

This provision, if given its literal meaning, makes it the duty of the board to redistrict a county only when, by reason of the vote therein cast at the preceding general election, it is entitled to a greater number of Representatives than it then has. The petitioner contends, however, that, notwithstanding this plain and unequivocal language, the amendment should not be construed literally but as though the words ''or lesser'' appeared after the term ''greater,'' because to do otherwise would defeat the real purpose of the amendment, the controlling thought back of it, which is to provide that each county should have one Representative for each 2,500 votes, or major fraction thereof, cast for Governor at the preceding general election, and no more. The gist of his argument is that it is just as much within the purpose of the amendment to redistrict the county when its vote has so decreased that it is, when measured by the twenty-five-hundred-vote standard, entitled to fewer Representatives, as it is when that vote, measured by the same yardstick, entitles it to a greater number, and he bases this contention upon the fact that the failure to redistrict when the vote has fallen off will have the effect of giving a county one Representative for a block of votes fewer in number than 2,500 and produce a situation the framers of the amendment never intended should arise, except in one instance, and that is, in the event the vote of the county should fall below that of 1930, the designated minimum. Maricopa county, for instance, will continue to have eighteen Representatives, or one for each 2,117 votes, instead of one for each 2,500 as the amendment provides, since it cast for Governor in 1934 only 38,111 votes, or 6,638 fewer than its 1932

vote of 44,749, upon which its allotment of eighteen Representatives was based. The only way, he claims, this unintentional working of the amendment can be avoided and its main purpose carried out, whenever there has been a decrease in the vote, is to construe it as requiring the board to redistrict the county when the change in its vote is of sufficient size to entitle it to a different number of Representatives, regardless of whether it means an increase or a decrease therein. The framers of this amendment, he argues, thought, when they incorporated in it the basic idea of one Representative for each 2,500 votes, they were establishing a rule that would automatically fix after each general election the number of Representatives to which each county is entitled and through its operation bring about a redistricting of any county with more than one Representative whose vote goes either up or down sufficiently to make this necessary.

It may seem at first thought that this is the proper construction of the amendment and that the petitioner is correct in contending that it should not be read literally but as though it contained the language suggested by him. It occurs to us, however, that, considering the amendment as a whole, the intention to require that a county be redistricted when its vote has decreased sufficiently to entitle it to fewer Representatives is not sufficiently plain and clear to justify the court, for the purpose of accomplishing this result, in adding to the amendment the words ''or lesser,'' or in construing it as though they were already a part of it. It is only where there is no doubt as to the intention of those who frame an amendment or statute that a court may modify, alter or supply words that will ''obviate any repugnancy to or inconsistency with such intention,'' and by so doing permit ''particular provisions'' to be read or

construed otherwise than "according to their literal meaning." *Clark* v. *Boyce,* 20 Ariz. 544, 185 Pac. 136, 137. While it was undoubtedly the purpose of this amendment that each county should elect one Representative for each 2,500 votes, or major fraction thereof, it was also the intention that this should be done within the limitations prescribed in the amendment itself. The first of these is that no county shall, under the twenty-five-hundred-vote standard, have a less number of Representatives than it was entitled to under its vote for Governor in 1930, and the second, that no county shall be redistricted, except when it is entitled to a greater number of Representatives. The intention seems to have been to provide that the counties be divided originally into districts on the basis of the 1932 vote and that the boundaries of the districts thus formed be preserved until the county, as a result of some future election, should be entitled to a greater number of Representatives. The fact that its vote might some time fall far enough below that on which the districts were based to entitle it to fewer Representatives seems not to have been a part of the intention. In other words, the proviso designates as the minimum representation any county may have as a result of the original or initial division of it into districts under the amendment, the number it would be entitled to according to its vote for Governor in 1930, and the clause stating when it shall be redistricted fixes as the minimum it may have as the result of redistricting in the future the number to which the last allotment of the board entitles it.

The thought back of this particular phase of the amendment probably was that the state is going forward, not backward, that its vote will increase, not decrease, and, hence, that there is no occasion to provide for a change in representation in case of a re-

duction in the county's vote. The framers likely felt that if the vote of a county at some subsequent election should be light it would be temporary only and, in all probability, come back stronger than ever two years later, in presidential years especially. A decrease in the vote under such circumstances would not mean necessarily that a legislator represents fewer people but merely that the interest in the election is not such that it attracts as large a percentage of the voters as it does at other times. For instance, it can hardly be said that Maricopa county's vote of 38,111 in 1934 which was 6,638 fewer than in 1932, signified a decrease in population. In fact, there appeared in the public press of the state some time in 1935 a statement by government authorities to the effect that its population is now 166,000, or an increase of 15,000 over that of 1930, and while the number of Representatives is based on its vote and not on its population, the latter is a factor the framers of the amendment had a right to and perhaps did consider in determining whether they should require that a county be redistricted if its vote should decrease at an off-year election to such an extent that it would be entitled to fewer Representatives.

The correctness of this construction is, in our view, strengthened by the fact that the amendment seeking to change section 1, part 2, article 4, of the Constitution, has been voted on by the people at three separate elections, 1918, 1930 and 1932, and each time it was submitted the identical language of the last paragraph of the above excerpt was a part of it. If those responsible for its wording had intended that it be construed as though it contained the words "or lesser," it would appear that they would have used language making that meaning clear. There seems to have been no question but that it was intended to convey

none other than its literal meaning prior to its submission in 1932, and this being true, the inference is that this particular language was chosen again that year in the belief that it means exactly what it says. In fact, it can hardly be said that those responsible for choosing it thought that the words "or lesser" would be implied, for it is only by the application of principles of construction unknown to the ordinary person that any question as to what it was intended to convey could ever arise. Its ordinary significance is so clear that no voter, without a fairly good knowledge of the law, would ever think of giving it the meaning contended for by the petitioner. Any person reading it would feel instinctively that by providing that a county shall be redistricted when "it shall be entitled to a greater number of representatives" the framers of the amendment meant to provide that those not entitled to a greater number should not be redistricted. The maxim, "the expression of one thing is the exclusion of another," is particularly applicable.

The contention that the voters of the state understood, when it was before them for their approval or disapproval, that it would apply in case of a decrease the same as in that of an increase is without force in so far as it refers to those who based their vote on the amendment itself. Those who acted on the theory that such was its meaning could not have looked solely to it for guidance. Even in the argument appearing in the publicity pamphlet supporting it there was no intimation that it would work automatically and compel a redistricting when the county's vote should change sufficiently, either up or down, to entitle it to a different number of Representatives.

It is suggested that the purpose of the amendment was to reduce the expense of the legislature and that

the language in question should be given the construction that best accomplishes this end. While the saving in expense was undoubtedly one of the reasons leading to the adoption of the amendment, whose subdivision 2 of section 1 reduces the per diem of its members, the number of attaches and their pay, and limits extra sessions to a period of twenty days, the particular part of this purpose intended to be brought about by reducing the membership was accomplished by increasing the number of voters each member should represent, and the working of the amendment discloses that this has been done, though, perhaps, not to the extent many would prefer. For instance, the membership of the House of Representatives of the Eleventh Legislature, the last one elected under the fifteen-hundred-vote ratio, was sixty-four, and of the Twelfth, the first under the twenty-five-hundred-vote ratio, fifty-one, though the latter would have been only thirty-seven had the vote of 1932 been the same as in 1930, which the framers used as a basis of allotment. If the amendment had not been adopted at all, however, the membership of the House in the Twelfth Legislature would have been eighty-one, as the result of the heavy vote in 1932, instead of fifty-one, and that of Maricopa county thirty instead of eighteen.

The action of the board of supervisors in declining to redistrict the county pursuant to the vote of 1934 was correct, hence the judgment of the trial court is reversed and the case remanded with directions to dismiss the petition.

LOCKWOOD, C. J., and ROSS, J., concur.