464 P.2d 955

**STATE of Arizona, Appellee,**

v.

**Waymond SMALL, Appellant.**

No. 1941.

Supreme Court of Arizona,
In Banc.

Feb. 10, 1970.

Gary K. Nelson, Atty. Gen., Carl Waag, Asst. Atty. Gen., Phoenix, for appellee.

Sam Lazovich, Miami, for appellant.

LOCKWOOD, Chief Justice.

Defendant appeals only from a sentence imposed after a plea of guilty to a charge of robbery. The sentence was a term of imprisonment of not less than twelve nor more than fifteen years in the Arizona State Penitentiary. Defendant was arraigned in the Superior Court on a charge of robbery on April 1, 1968. At that time the court corrected the record to show his correct name and asked if he had an attorney or had funds with which to em-

ploy an attorney. The defendant replied that he did not have an attorney and said, "the court will have to appoint me an attorney." The court, after one or two further questions regarding indigency, thereupon appointed Attorney Sam Lazovich to represent the defendant. Attorney Lazovich requested time in which to consult with the defendant and the matter was set for the following Monday, April 8, 1968.

On April 8, 1968, the defendant and his attorney appeared in court and the defendant entered a plea of not guilty. A trial was set for May 28th and the court stood at recess. However, within a few moments the defendant and his counsel asked the court to reconvene at which time the attorney stated:

"Your Honor, I would like to make a statement to the Court in this matter. Mr. Small a little while ago pleaded 'not guilty' and the trial was set for the 28th of May, 1968, at 9:30, and I presume it was in front of a jury.

"Anyway, after the court recessed I went over in the hallway to talk to my client, and he seemed to be very much dissatisfied with the plea he had entered, and he has been insisting he wants to change his plea to that of 'guilty', and he said he wants to get it over with.

"I reluctantly wish to advise the Court that there isn't anything that I as his attorney can do except follow his advice because after all this is his life. I tried to talk to him in there that he ought to wait a short period of time, and that this is a very very serious offense, and that I had been appointed by the court to see what I could do to help this young man, and my understanding at this time is that he wishes to change his former plea of 'not guilty' to that of 'guilty', and I believe that the court should look into this matter at least for this coming—for another week before passing sentence, and I would like to

have the sentencing this coming Monday."

The defendant then spoke to the court as follows:

"I would like to plead 'guilty' because *I've always represented myself as a robber, and I don't want to continue and try to sneak around and connive my way through by being a liar.* I would like to enter a plea of 'guilty.'" (Emphasis supplied.)

The court then proceeded to question the defendant in a commendably fair and thorough manner, as to his understanding of what he was doing in entering a plea of guilty, and whether he understood the consequences thereof as follows:

"Q. You understand this is—the charge against you is robbery. You understand that?

"A. Yes.

\*   \*   \*   .\*   \*   \*

"Q. How far did you go in school?

"A. Through the 8th grade.

\*   \*   \*   \*   \*   \*

"Q. You understand when you enter a plea of 'guilty' you have no right to a trial by jury then?

"A. Yes.

"Q. And it is up to the judge to sentence you, and there is no further right of a hearing. You understand that?

"A. Yes.

"Q. You understand that robbery is a crime that carries a sentence up to life in the Arizona State Penitentiary?

"A. Yes.

"Q. And that the minimum sentence is five years. You understand that?

"A. Yes.

"Q. And has anyone offered you anything to confess—in other words, said they would help you out if you enter a plea of 'guilty'?

"A. To help me out?

"Q. Has anyone told you if you would enter a plea of 'guilty' you would get a suspended sentence, or anything like that?

"A. No.

"Q. And you have no agreement with the County Attorney or with the Sheriff as to what the sentence might be?

"A. No, sir, I look at it like this, you know: regardless if I wait or if I plead 'guilty' now it actually probably would be the same. *This county jail over here —it's really getting to me; I have no way of moving around or anything, and the other day the sheriff come up and he looked like he had on a pair of earrings, you know. I'm cracking up in the county jail; I've never been locked up like that before and I can't take it.*

"Q. You have been in the county jail how long?

"A. Two weeks and two days.

"Q. You agree you actually did go into the Coat of Arms Store on the 23rd of March?

"A. Yes, sir.

"Q. And threatened Robert Markham there? You threatened him with a gun or something?

"A. No, I just asked him for his money.

"Q. Did you have a gun with you?

"A. Yes, sir.

"Q. Did you show it to him?

"A. Yes, sir.

"Q. And he did give you some money?

"A. Yes, sir.

"Q. And some clothing as alleged in the Information?

"A. He didn't give me no clothing.

"Q. You took them?

"A. Yes." (Emphasis supplied.)

The court thereupon directed that the plea be taken and the defendant entered a plea of guilty. The court set a time for sentence for the following Monday.

However, in the meantime and before the time set for sentence, the following occurred: In some manner the defendant appeared in the main office of the sheriff at the time that certain trusties were removing garbage cans from the jail. Defendant requested permission from the deputy sheriff in charge to help carry out the cans. Defendant and the trusties walked out of the office to the alley with the garbage cans. The trusties returned but the defendant kept on walking. Defendant was apprehended some four days later and returned to the County Jail, at which time an additional charge was filed against him for "escape from the County Jail."

On May 6th the defendant was brought before the court presumably for arraignment on the escape charge and the court appointed Attorney Lazovich to represent the defendant on the new charge. The attorney then requested that a Rule 250, 17 A.R.S., hearing be held for determination of whether the defendant was able to understand the proceedings against him or assist in his defense. The defendant was arraigned on the escape charge at this time, but was not required to enter a plea pending the outcome of the Rule 250 hearing.

The court appointed Dr. Maier Tuchler, a psychiatrist, and Dr. Walter O'Brien, a medical doctor, to make the examination of the defendant. On May 15th the court held a hearing at which the two doctors testified as to the ability of the defendant to understand the proceedings against him and to assist in his defense. Dr. Tuchler testified as follows:

"A. He was of good intelligence. I consider him in the medical sense sane and competent; that he knew the right from wrong; that he was capable of communicating and cooperating with his attorney; that he had difficulty in following the right because of the personality structure, and that at times he would be mentally ill; but at the time I ex-

amined him on May 10th he did not show evidence of psychotic behavior; that is, had—stated no hallucinatory nor delusionary behavior at that time."

Dr. O'Brien testified that he had just had a few brief words with the defendant before the hearing, and upon request of defendant's attorney court was recessed so that Dr. O'Brien could interview the defendant for a greater length of time. He did so for a period of a half hour or more. Court reconvened and Dr. O'Brien was questioned as to his opinion whether the defendant understood the proceedings against him and whether he was capable of assisting in his defense. The doctor answered both questions affirmatively, and also stated that he believed the defendant "knew the difference between right and wrong all along."

In the course of the examination of Dr. O'Brien there was testimony that the defendant had had difficulties since the age of nine, and that he had also at one time had electric shock treatments.

During the hearing on redirect examination by the County Attorney the following questions and answers were asked and made:

"Q. I notice while Mr. Lazovich has been cross-examining you here that Mr. Small has been prompting him to ask these questions. Have you noticed that?

"A. Yes, I noticed that.

"Q. Does that show, demonstrate right here in court that he is able to assist his counsel?

"A. He is definitely assisting him.

"Q. By his own conduct.

"A. By his own apparent conduct, yes.

"Q. And in the case history that came to you from the various reports which is referable to his conduct as set forth in these case histories—written case histories—from his age of nine years—

"A. That's right.

"Q. —have you found in any of those that his life has been, from the year—since he was nine years old to the present time a life of crime off and on?

"A. Off and on, yes, but not a life of crime.

"Q. Well, I mean it has been—I mean he has been engaged.

"A. There have been episodes, yes.

"Q. From the early age of nine years?

"A. That's right."

On re-cross examination by Attorney Lazovich the following testimony was adduced:

"Q. Doctor, you don't mean he started a so-called crime wave at the age of nine.

"A. If I can find it I will read it to you. It isn't exactly crime, but he was, at the age of nine, in Doctor Tuchler's report, I see here he was—he states he was raised by his mother and sent to a children's home before he was ten years old. The reason for that is somewhere back here—he readily admits delinquency and reports he was sent to the Fairfield School for Boys and the Industrial School at Lancaster, Ohio, on at least three or four occasions between the ages of twelve and fifteen.

"Q. So his delinquency started when he was about twelve. Is that it?

"A. That's what it appears to be, yes, by his own statement; he readily admits delinquency and reports he was sent to—

"Q. From the age of twelve on?

"A. Yes, but from the age of nine he was sent somewhere—do you remember? 1954, that would be about it, whatever JDC is, under previous mental illness, and this is the report from—well, one of the many hospitals he was in. Patient was in JDC in 1954. What is JDC? This is a history of previous mental illness. It mentions the patient was in JDC in 1954, and was non-psychotic at that time. However, the psychotic examination sug-

gested a pre-psychotic state. Now, that is not criminal, I grant you, but that is in 1954."

On subsequent redirect examination Dr. O'Brien was asked to read from a report prepared by Dr. Tuchler. He related the report as follows:

"A. This is Page One of Doctor Tuchler's report, the last paragraph. In this report there is a statement that the boy threatened to hang himself at the age of nine when sent to the Juvenile Diagnostic Center in Columbus for a period of six months. He was in trouble at that time and he was sent there for diagnostic purposes.

Dr. O'Brien's testimony concluded the state's evidence. The defendant presented no testimony or evidence. The court then entered the following judgment:

"THE COURT: The court heard the testimony, and it is the judgment of the court that the defendant does understand the nature of the proceedings against him, and that he is capable of assisting counsel in his defense."

On May 20, 1968, the court reconvened. The defendant first entered a plea of "not guilty" to the escape charge, and then the court turned to this matter for sentencing. The defendant's attorney made a statement, which was a summary of the pre-sentencing report prepared by the Court's Probation Officer, Jay L. Warner. This report has been appended to Appellant's Opening Brief.

Although in may criminal cases before this Court we are totally unable to understand why the defendant has acted in the violent anti-social manner in which he has, such is not the case here. Here, the pre-sentencing report has given us a glimpse into the social and mental background of this young man. It is a thorough case study of the defendant as an individual, prepared by a probation officer who did an excellent job to give the judge an opportunity to exercise his best judgment on the sentence.

The report shows that the defendant was born June 9, 1945, in Cedar Bluff, Alabama. He was one of five children. His father abandoned the family when the defendant was very young and his mother subsequently divorced him and remarried. His step-father died and defendant remembers little about him. In 1949, the defendant's mother moved the family from Alabama to Ohio, and they settled in Columbus.

In 1954, when the defendant was nine, he had his first recorded experience with a correctional institution. At this time he was sent to the Juvenile Diagnostic Center in Columbus, Ohio, because he tried to hang himself. He remained there for six months. From there he was placed in the Franklin County Village (a home for neglected minors) where he remained for four months before returning to his mother's home. At age twelve (1957) he was sent to the Fairfield School for Boys in Lancaster, Ohio, (an industrial school) because of delinquent behavior and problems in school. During the next two years the defendant was in and out of the Fairfield School for Boys three times before being sent back to the Juvenile Diagnostic Center. He was at the Diagnostic Center for three months and was then returned to the Fairfield School.

In 1960 he ran away from Fairfield and went to Cordele, Georgia, where he lived with a family friend. While in Georgia, the defendant became involved in difficulties with the law. He was sent to an institution in Alto, Georgia, where he remained for about a year.

In 1962, after leaving Alto, Georgia, he returned to Columbus, Ohio. He learned from an uncle that his father was in Phoenix, Arizona. In December of 1962, the defendant came to Phoenix, Arizona and lived with his father for a few months before the two left for Houston, Texas.

In June of 1963 he went back to Columbus, Ohio, and tried to jump into the Scio River. As a result, he was placed in a hospital until August of 1967 when he

walked off and went home to live with his mother. He remained with his mother until October of 1967, when he went to Perris, California to stay with his father. He remained in California until February of 1968 when he came to Phoenix, Arizona. From Phoenix he went to Globe and the incidents resulting in this incarceration arose.

Under the prevailing theory of penology, once a person has been convicted of a crime, our system of criminal justice then has three basic responsibilities. First, it must exact a penalty from the person; second, it must protect society from this person until he may be returned to society to lead a productive life; and third, while protecting society, it must attempt to rehabilitate the individual so that he can be released as a beneficial member of society. The case of Waymond G. Small is a classic example of the failure of our penal system to accomplish two of these responsibilities. The pattern of criminal involvement has been established, and the mold is set.

Defendant asks this Court to review and reduce the length of his prison sentence because, under the circumstances of this case, it is so severe as to shock the moral sense of the community. A.R.S. § 13–1717, subsec. B authorizes us to review and reduce sentences imposed by a trial court. Our attitude on the exercise of this authority is expressed in State v. Maberry, 93 Ariz. 306, 309, 380 P.2d 604, 606 (1963):

> "Because a defendant appears in person before the trial judge, the trial judge is, in most instances, better able than we to evaluate him and to determine what is necessary to rehabilitate him to constructive activity. It is for this reason that the legislature has given the trial court wide discretion to sentence a defendant for a period somewhere between a statutory minimum and a statutory maximum. [citations] We have traditionally been prone to uphold a sentence declared by a trial judge when it is in conformity with the statute and there is no clear evidence

that he has abused his power in the particular case * * *."

We cannot say the trial court at this point in time abused its discretion in imposition of the sentence, which is within the statutory minimum and maximum limits.

Judgment affirmed.

STRUCKMEYER, V. C. J., and UDALL, McFARLAND, and HAYS, JJ., concur.