352 P.3d 925

Tom HIRSCH (aka Tomas N. Hirsch) and Diane Rose Hirsch, husband and wife; Berta Friedman Walder (aka Bunny Walder), a married person; Howard Evan Walder, a married person; Harish Pannalal Shah and Madhavi H. Shah, husband and wife, Plaintiffs/Appellants,

v.

ARIZONA CORPORATION COMMISSION, Defendant/Appellee.

No. 1 CA–CV 14–0408.

Court of Appeals of Arizona, Division 1.

June 25, 2015.

---

458

LaVelle & LaVelle, PLC By Michael J. LaVelle, Matthew K. LaVelle, Phoenix, Counsel for Plaintiffs/Appellants.

Arizona Corporation Commission By Julie A. Coleman, Phoenix, Counsel for Defendant/Appellee.

Judge KENTON D. JONES delivered the opinion of the Court, in which Presiding Judge MARGARET H. DOWNIE and Judge JON W. THOMPSON joined.

## OPINION

JONES, Judge:

¶ 1 Appellants appeal from a judgment entered by the superior court affirming an order of the Arizona Corporation Commission (Commission) finding Appellants had committed numerous violations of the registration and anti-fraud provisions of the Arizona Securities Act (ASA), Arizona Revised Statutes (A.R.S.) sections 44–1801 [1] to –2126, levying administrative penalties totaling $4.65 million and ordering nearly $190 million in restitution. For the following reasons, we hold the Commission was authorized by statute and administrative rule to impose the administrative penalties levied and determine the amount of restitution owed. We further hold the Commission acted within its discretion in ordering the restitution and penalties

---

1. Absent material changes from the relevant date, we cite a statute's current version.

against Appellants, and, therefore, affirm the superior court's order.

## FACTS[2] AND PROCEDURAL HISTORY

■ ¶ 2 On March 12, 2009, the Securities Division (Division) of the Commission initiated an administrative proceeding against Radical Bunny, L.L.C. (Radical Bunny) and Appellants.[3] The Division alleged Radical Bunny and Appellants had violated the registration and antifraud provisions of the ASA, specifically A.R.S. §§ 44–1841 (sale of unregistered securities), –1842 (sale of securities by unregistered dealers and salesmen), and –1991 (fraud in purchase or sale of securities). The Division further alleged Appellants were jointly and severally liable for the violations of Radical Bunny, as controlling persons, pursuant to A.R.S. § 44–1999(B). In April 2010, Radical Bunny signed a consent and decision order agreeing to pay restitution in the amount of $189,800,867 for the registration and anti-fraud violations described below. This appeal arises out of the Commission's enforcement action against Appellants, who were not part of the consent and decision order with Radical Bunny.

### A. The Investment Scheme

¶ 3 The Commission's enforcement action concerned two separate loan programs conducted from 1999 to 2008 by Radical Bunny and Mortgages, Ltd. (ML). Radical Bunny was a member-managed limited liability company formed in 1999 for the specific purpose of pooling funds to invest in ML. Appellant Hirsch has been a member manager of Radical Bunny since its inception.

¶ 4 ML operated as a private mortgage lender for residential and commercial real estate projects, typically providing what is commonly referred to as bridge financing. As part of these operations, ML originated, invested in, sold, and serviced short-term loans secured by the underlying real estate.

### 1. The ML Pass–Through Program

¶ 5 The first loan program Radical Bunny invested in was the ML Pass–Through Program (P–T Program), which ML used to help fund loans to its borrowers. Under this program, investors such as Radical Bunny received a "pass-through" fractional loan and lien interest in ML's loans and the collateral used to secure a specific loan. The investor thereby acquired an interest in the promissory note evidencing ML's loan and was assigned a beneficial interest in the corresponding real estate collateral, with the assignment recorded with the appropriate county recorder.

¶ 6 Radical Bunny raised the funds it invested in the P–T Program by selling membership interests in its own company. Appellants found investors for Radical Bunny through referrals and general word of mouth. Investors would purchase a membership interest in Radical Bunny, which would then invest the money in the P–T Program; all endorsements of the secured promissory notes and corresponding assignments of beneficial interests in the underlying real estate collateral were then issued and recorded in Radical Bunny's name.

¶ 7 Radical Bunny issued a "Direction to Purchase" to each investor that authorized a managing member of Radical Bunny, as the investor's agent, to acquire an interest in a specific ML loan. The Direction to Purchase also stated essential information, such as the amount invested, the investor's *pro rata* share in the ML loan, the annual interest rate owed to the investor, and the maturity date of the ML loan. For its services in facilitating the transaction, Radical Bunny

---

**2.** We view the facts in the light most favorable to upholding the Commission's decision. *See Eaton v. AHCCCS*, 206 Ariz. 430, 431, ¶ 2, 79 P.3d 1044 (App.2003); *see also State v. Barber*, 133 Ariz. 572, 578, 653 P.2d 29 (App.1982) (noting, in reviewing whether evidence of securities-related crimes was sufficient for presentation to the jury, "all reasonable inferences must be resolved against the appellant").

**3.** The Division also named Horizon Partners, L.L.C. (Horizon) in the action. Horizon was formed by Appellant Tom Hirsch in 1997 to invest in products offered by Mortgages, Ltd., and essentially subsumed into Radical Bunny in 2005. The Commission found Horizon committed multiple violations of the ASA and levied an administrative penalty against it in the amount of $150,000. However, Horizon did not appeal the decision and is not a party to this appeal.

collected a management fee ranging from 0.25 to 0.5 percent of the interest paid by ML to Radical Bunny investors. Radical Bunny never registered the sale of its membership interests with the Commission, and neither Radical Bunny nor Appellants were registered with the Commission as securities dealers or salespersons. Radical Bunny raised approximately $40 million from investors between 1999 and 2005.

¶ 8 In mid–2005, Appellants Shah and Walders joined Radical Bunny as member-managers. Shortly thereafter, Radical Bunny curtailed its investment activity in the P–T Program to concentrate on a second loan program that became the major focus of the Commission's enforcement action: the RB–ML Loan Program.

### 2. The RB–ML Loan Program

¶ 9 The RB–ML Loan Program operated differently than the P–T Program, as Radical Bunny transitioned from being a "pass-through" investor in loans originating from ML to making loans directly to ML, with ML using the proceeds to fund loans to its own borrowers. Radical Bunny raised funds for this program, which essentially operated as a line of credit to ML, by selling fractional interests in the RB–ML loans. Participants would advance funds to Radical Bunny, which would hold the funds until an ML loan became available; Radical Bunny would then advance the funds to ML, and ML would sign a promissory note evidencing the loan in Radical Bunny's favor. These loans were typically for a term of one year and carried an annual interest rate of thirteen percent. ML made monthly interest payments to Radical Bunny, which, in turn, made monthly interest payments to Radical Bunny participants. Participants received an eleven percent return on their investment, and Radical Bunny received the two percent spread as a management fee. When a particular loan matured or was repaid in full, participants were given the option to "rollover" the principal into a new RB–ML Loan or liquidate the principal amount.

¶ 10 As with the P–T Program, Radical Bunny issued each participant a "Direction to Purchase" stating the amount invested by the participant, the investor's proportional share in a specific RB–ML loan, the annual interest rate due the participant, and the loan maturity date. Unlike the Direction to Purchase used in the P–T Program, however, this Direction to Purchase did not identify any specific collateral securing the RB–ML loan, but simply asserted, "Your investment is collateralized by the beneficial interest under various deeds of trusts held by [ML]."

¶ 11 In late 2006, Appellants became aware the RB–ML Loan Program could be operating in violation of federal and state securities laws and sought legal advice concerning Radical Bunny's business structure and activities. In January 2007, Appellants met with attorneys Ronald Logan and Carl Ranno. After hearing a description of Radical Bunny's business activities, Logan advised Appellants they "could not do business in the future without violating some State or Federal regulatory scheme," and were in violation of federal and/or state law by operating Radical Bunny without a license. Again, during the existence of this program, Radical Bunny never registered its sale of the interest in the loans with the Commission, and neither Radical Bunny nor Appellants registered as securities dealers or salespersons.

¶ 12 In February 2007, attorneys at Quarles & Brady (Q & B), advised Appellants for the second time that it was likely the RB–ML program violated state and federal securities laws. Q & B further advised Appellants the RB–ML loans might not be secured at all. Several months later, Q & B informed Appellants it believed they had in fact violated federal and state securities laws and the collateral documents securing Radical Bunny loans were indeed defective. Q & B advised Appellants to stop accepting participants in its programs until they complied with applicable securities laws. Despite these admonitions, Radical Bunny continued to solicit participation in the RB–ML Loan Program.

¶ 13 The RB–ML Loan Program was discontinued in June 2008 after ML filed for bankruptcy. At the time of ML's bankruptcy filing, Radical Bunny had approximately $197 million in outstanding loans to ML involving 900 participants and evidenced by ninety-nine separate promissory notes. ML

stopped making monthly interest payments, and Radical Bunny filed for bankruptcy in October 2008. This enforcement action followed.

## B. The Administrative Hearing

¶ 14 Following a twelve-day hearing, the Commission determined both the limited liability membership interests sold by Radical Bunny between 1999 and 2005, and the investment contracts and notes sold by Radical Bunny between 2005 and 2008, were unregistered, nonexempt "securities" for purposes of the ASA. The Commission also found Radical Bunny and Appellants offered and sold unregistered securities from or within the State of Arizona without registering as securities dealers or salespersons. Furthermore, the Commission determined that, in connection with the offer and sale of these securities, Appellants violated each of the anti-fraud provisions contained within A.R.S. § 44–1991.[4] Specifically, the Commission found Appellants misled investors by: (1) providing inaccurate information about the nature, quality, and sufficiency of the collateral securing the RB–ML loans, and thereafter failing to inform investors of the concerns surrounding the collateral identified by its attorneys in 2007; (2) representing ML and its CEO were financially sound, which Appellants emphasized by telling investors Hirsch and Shah reviewed ML's financial information while preparing its tax returns, without having performed any due diligence; (3) misrepresenting the manner in which participants' funds would be used by ML;[5] and (4) withholding from participants the suspicion, and later knowledge, that Radical Bunny was operating in violation of Arizona securities laws.

¶ 15 Based upon these findings, the Commission concluded Appellants were primarily liable for violations of the registration and antifraud provisions of the ASA, and also jointly and severally liable as "control persons" of Radical Bunny, pursuant to A.R.S. § 44–1999(B). Accordingly, the Commission ordered Radical Bunny and Appellants to cease and desist from further securities violations. The Commission also ordered Appellants to pay restitution in the amount of $189,800,867 to the 900 remaining Radical Bunny participants, subject to offsets from related federal judicial proceedings. Finally, the Commission ordered Appellants Hirsch, Berta Walder, Howard Walder, and Shah to pay administrative penalties in the amounts of $2 million, $1.25 million, $750,000, and $500,000, respectively.[6]

¶ 16 Appellants timely appealed the Commission's decision to the superior court. Following briefing and oral argument, the court adopted and affirmed the Commission's findings and orders. Appellants timely appealed to this Court. We have jurisdiction pursuant to Article 15, Section 17, of the Arizona Constitution, and A.R.S. §§ 12–913 and –2101(A)(1).

## DISCUSSION

¶ 17 On appeal, Appellants do not contest the Commission's conclusion that they offered and sold securities subject to regulation under the ASA. Nor do they contend the securities were actually registered or exempt, or that either Appellants or Radical Bunny was registered to sell securities. Instead, Appellants raise several issues concerning the sufficiency of the evidence supporting the various violations and the Commission's calculation of the restitution award and administrative penalties.

¶ 18 "On appeal from a superior court's review of an administrative decision, we must determine, as did the superior court,

---

4. Section 44–1991(A) prohibits a person, in connection with any transaction involving the sale or offer to sell securities, from "employ[ing] any device, scheme or artifice to defraud," "mak[ing] any untrue statement of material fact, or omit[ting] to state any material fact," or "engag[ing] in any transaction, practice or course of business which operates or would operate as a fraud or deceit."

5. Appellants represented to new and existing participants that their funds were to be used by ML solely to fund loans to its own borrowers. However, no document limited ML's use in such a manner, and in fact ML used $35 million to fund its general business operations.

6. The Commission did not delineate within its order the specific violations or penalties it considered in calculating these sums.

whether the administrative action was illegal, arbitrary, capricious or involved an abuse of discretion." *Eaton*, 206 Ariz. at 432, ¶ 7, 79 P.3d 1044 (citing *Samaritan Health Servs. v. AHCCCS*, 178 Ariz. 534, 537, 875 P.2d 193 (App.1994)); *see also Ariz. Corp. Comm'n v. Pac. Motor Trucking Co.*, 116 Ariz. 465, 466, 569 P.2d 1363 (App.1977) (noting it was the burden of the party contesting a decision to show "by clear and satisfactory evidence that the Commission's decision was unreasonable or unlawful") (citing *Ariz. Corp. Comm'n v. Reliable Transp. Co.*, 86 Ariz. 363, 372, 346 P.2d 1091 (1959)). " 'When reviewing a superior court's *de novo* review of a Commission order this Court will not conduct a separate *de novo* trial but will uphold the trial court's judgment if it is supported by any reasonable evidence.' " *Ariz. Corp. Comm'n v. Citizens Utils. Co.*, 120 Ariz. 184, 187, 584 P.2d 1175 (App.1978) (quoting *Sun City Water Co. v. Ariz. Corp. Comm'n*, 113 Ariz. 464, 465, 556 P.2d 1126 (1976)). We review *de novo*, however, questions of law, including issues of statutory interpretation. *Webb v. State ex rel. Ariz. Bd. of Med. Examn'rs*, 202 Ariz. 555, 557, ¶ 7, 48 P.3d 505 (App.2002) (citing *Hansson v. State Bd. of Dental Exam'rs*, 195 Ariz. 66, 68, ¶ 6, 985 P.2d 551 (App.1998)).

## I. ASA Registration and Anti–Fraud Violations

### A. The Loss Causation Requirement Does Not Apply in Enforcement Actions Brought by the Commission.

¶ 19 Appellants argue the Commission is required to prove loss causation in every securities case and for each type of securities violation, including registration violations. Because the Commission did not present proof of loss causation as to each of the 900 participants,[7] Appellants argue the Commission's conclusion that they violated the ASA and the corresponding imposition of administrative penalties were unsupported by evidence and therefore, legally erroneous. We disagree.

¶ 20 "Loss causation is nothing more than proximate cause—'the allegedly

unlawful conduct caused the economic harm.' " *Grand v. Nacchio*, 214 Ariz. 9, 19, ¶ 30, 147 P.3d 763 (App.2006) (quoting *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir.2000)). Appellants argue *Grand* extended the loss causation requirement to "*all* statutory and common law securities cases." In response, the Commission contends *Grand*'s holding applies only to private securities actions.

¶ 21 The answer is statutory. Arizona's loss causation requirement is codified in A.R.S. § 44–2082(E), which states in relevant part:

> [I]n any *private action* arising under [Title 44, chapter 12 of the Arizona Revised Statutes], the plaintiff has the burden of proving that the act or omission of the defendant alleged to violate the section under which the *private action* is brought caused the loss for which the plaintiff seeks to recover damages.

(Emphasis added). Thus, by its plain language, A.R.S. § 44–2082(E) limits the requirement of loss causation to private actions. And, where a statute's language is clear and unambiguous, we give full effect to that language. *Heatec, Inc. v. R.W. Beckett Corp.*, 219 Ariz. 293, 295, ¶ 6, 197 P.3d 754 (App.2008) (citing *Janson ex rel. Janson v. Christensen*, 167 Ariz. 470, 471, 808 P.2d 1222 (1991)). Contrary to Appellants' position, we held in *Grand* only that a plaintiff in a private action brought under the ASA for damages "must prove loss causation unless the statute governing that claim specifies otherwise." 214 Ariz. at 26, ¶ 55, 147 P.3d 763. And *Grand* further specifically recognizes that A.R.S. § 44–1991(A)(2) (prohibiting false statements or material omissions in the offer or sale of securities) does *not* require a plaintiff to prove loss causation; instead, the lack of loss causation may be asserted as an affirmative defense to the charge. *Id.* (citing A.R.S. § 44–2082(E)).

¶ 22 Additionally, Arizona's loss causation requirement with respect to its anti-fraud provisions closely mirrors that of its federal counterpart, rendering federal interpretations instructive. *Id.* at ¶ 58; *see also* 1996

---

**7.** Appellants acknowledge evidence of loss causation was provided as to the five Radical Bunny participants that testified at the enforcement hearing.

Ariz. Sess. Laws, ch. 197, § 11(C) (2d Reg. Sess.) (encouraging courts to "use as a guide the interpretations given by the securities and exchange commission [ (SEC) ] and the federal or other courts in construing substantially similar provisions in the federal securities laws of the United States" when construing the ASA). And federal courts have consistently held that the loss causation requirement does not apply in a federal enforcement action. *See, e.g., SEC v. Pirate Investor L.L.C.,* 580 F.3d 233, 239 n. 10 (4th Cir.2009) ("Unlike private litigants, the SEC need not prove the additional elements of reliance or loss causation.") (citing *SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1364 (9th Cir.1993)); *see also SEC v. Morgan Keegan & Co., Inc.,* 678 F.3d 1233, 1244 (11th Cir. 2012) (similar); *SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir.1985) (similar) (citing *SEC v. N. Am. Research & Dev. Corp.,* 424 F.2d 63, 84 (2d Cir.1970); *Berko v. SEC,* 316 F.2d 137, 143 (2d Cir.1963); and *SEC v. Lum's, Inc.,* 365 F.Supp. 1046, 1059 (S.D.N.Y.1973)).

¶ 23 Neither party specifically addresses application of the loss causation requirement to the ASA's registration provisions in an enforcement action brought by the Commission. We can discern no reason to treat these provisions differently than those addressing fraud, particularly in light of the statutory language, the immateriality of reliance in performing the Commission's enforcement purpose, *see Morgan Keegan,* 678 F.3d at 1244, and federal case law omitting the requirement, *see SEC v. Calvo,* 378 F.3d 1211, 1214 (11th Cir.2004) (listing elements of a *prima facie* registration violation under federal law, which did not include proof of causation) (citing *SEC v. Cont'l Tobacco Co.,* 463 F.2d 137, 155 (5th Cir.1972)); *see also SEC v. Friendly Power Co. L.L.C.,* 49 F.Supp.2d 1363, 1373 (S.D.Fla.1999) (imposing civil penalty for registration violation where the "failure to register the[ ] securities . . . created a substantial risk that the investors would lose their investments").

¶ 24 We hold the loss causation requirement articulated in A.R.S. § 44–2082(E) is applicable only to private actions brought pursuant to Title 44, chapter 12 of the Arizona Revised Statutes. Accordingly, the Commission did not err in concluding Appellants violated the registration and anti-fraud provisions of the ASA even absent evidence of loss causation.

**B. Sufficient Evidence Supports the Commission's Finding that Appellants Violated A.R.S. § 44–1991(A)(2).**

¶ 25 The Commission found Appellants committed 900 violations of A.R.S. § 44–1991(A)(2)—one for each participant remaining in either of Radical Bunny's loan programs at the time it filed for bankruptcy. Under this section, a person commits fraud in connection with the offer or sale of securities if that person "[m]ake[s] any untrue statement of material fact, or [fails] to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." A.R.S. § 44–1991(A)(2); *see also Aaron v. Fromkin,* 196 Ariz. 224, 227, ¶ 15, 994 P.2d 1039 (App.2000) (noting A.R.S. § 44–1991(A)(2) "imposes an affirmative duty not to mislead") (citation omitted).

¶ 26 Appellants first contend that only five violations are supported by the record because only five participants testified regarding the materiality of Appellants' representations. They argue that, except for the five participants who testified, the Commission failed to show "a substantial likelihood that the omitted facts would have assumed actual significance in the buyer's decision."

¶ 27 Materiality is based upon an objective standard. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ("The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor."); *Rose v. Dobras,* 128 Ariz. 209, 214, 624 P.2d 887 (App.1981) (adopting *TSC Industries* as the Arizona standard for materiality under securities law). The requirement of materiality is satisfied by "a showing of substantial likelihood that, under all the circumstances, the misstated or 'omitted fact would have assumed actual significance in the deliberations' of a *reasonable*

buyer." *Trimble v. Am. Sav. Life Ins. Co.,* 152 Ariz. 548, 553, 733 P.2d 1131 (App.1986) (quoting *Rose,* 128 Ariz. at 214, 624 P.2d 887). "Under this test, there is no need to investigate whether an omission or misstatement was actually significant to a particular buyer." *Id.*

¶ 28 Here, after hearing testimony and reviewing documentary evidence, the Commission found the misstatements and omissions by Appellants were a substantial factor in a reasonable buyer's decision to invest. This determination is supported by the record. Appellants misrepresented the status and sufficiency of the collateral purportedly securing the loans to ML, inappropriately vouched for the financial stability of ML and its CEO, misstated the manner in which the loans would be used by ML, and thereby misrepresented the degree of risk involved in the investment. Moreover, Appellants were on notice for at least a year they were violating securities laws but did not disclose this concern despite the fact that the information could not possibly have been perceived as insignificant to their participants.

¶ 29 Appellants next argue Radical Bunny had an "equitable lien" against ML's assets, and therefore, their statements to participants concerning the existence of collateral securing the loans to ML were not misleading. As an initial matter, we note Appellants do not challenge the other misstatements and omissions upon which the Commission's finding is based, and those deficiencies persist. Therefore, we remain convinced that reasonable evidence supports the Commission's finding that Appellants violated A.R.S. § 44–1991(A)(2).

¶ 30 Moreover, assuming Radical Bunny had an equitable interest in ML's assets, Appellants' statements to investors were misleading as to the existence, sufficiency, and type of security interest underlying the loans made to ML. In each Direction to Purchase sent to Radical Bunny's participants, Appellants stated, "Your investment is collateralized by [a] beneficial interest under various deeds of trusts held by [ML]." A beneficial interest is "[a] right or expectancy in something ... as opposed to legal title to that thing. For example, a person with a benefi-

cial interest in a trust receives income from the trust but does not hold legal title to the trust property." Black's Law Dictionary (10th ed.2014).

¶ 31 In contrast, an equitable lien has been defined as:

[A] right over property constituting an encumbrance, so that the property itself may be proceeded against in an equitable action and either sold or sequestered upon proof of a contract out of which the lien could grow or of a duty on the part of the holder so as to give the other party a charge or lien on it.

*Wolfswinkel v. Superior Court ex rel. Gila Cnty.,* 145 Ariz. 154, 156, 700 P.2d 852 (App. 1984). Importantly, the purported equitable lien interest "is merely floating equity until the time that a judgment or decree is rendered actually subjecting the property to the payment of the debt or claim." *Id.* (citations omitted). That Radical Bunny might have been able to pursue ML's assets at some point in the future is radically different, in both design and substance, from the actual first position, secured interest in real estate Appellants promised their investors. *See In re Naarden Trust,* 195 Ariz. 526, 529, ¶ 11, 990 P.2d 1085 (App.1999) (noting material differences between a beneficial interest in property, created via trust, versus a personal claim against the promissor, created via contract).

¶ 32 Moreover, participants were sent a "Loan Participation Disclosure Statement and Acknowledgements" referencing a security agreement with ML that simply did not exist. And, even after being specifically advised there was no collateral securing the RB–ML Loans, Appellants continued to mislead their investors and took no steps to correct the previous misstatements. The record contains substantial evidence to support the Commission's determination that Appellants violated A.R.S. § 44–1991(A)(2), and we find no error.

## II. Administrative Penalties

¶ 33 Appellants contend the administrative penalties imposed by the Commis-

sion—totaling $2.15 million against Hirsch,[8] $1.25 million against Berta Walder, $750,000 against Shah, and $500,000 against Howard Walder—are contrary to the evidence. Specifically, Appellants contend that "only five transactions were proven which justify [administrative penalties]" because only five investors testified about their personal dealings with Radical Bunny. Accordingly, Appellants argue the highest aggregate amount of penalties the Commission could impose upon them for the anti-fraud violations was $25,000.

¶ 34 The Commission is authorized by A.R.S. § 44–2036(a) to assess an administrative penalty against a person found to have violated the ASA, or other rule or order of the Commission, "in an amount [ ] not to exceed five thousand dollars for each violation." Here, the Commission found each Appellant had committed 900 violations of *both* of the registration provisions *and* the anti-fraud provision, for a total of 2,700 violations, and would have been within its power to assess administrative penalties of $13.5 million. However, at the recommendation of the Division, the Commission adopted the penalty amounts stated above.

¶ 35 We find no abuse of discretion. Even if Appellants' antifraud penalties were capped at $25,000, the total penalty amounts are amply supported by the record. It is undisputed Appellants did not register the securities they offered and sold to 900 participants, were not registered securities dealers or salespersons, and are responsible for 1,800 separate violations of the ASA's registration provisions. These facts alone support a maximum aggregate penalty of $9 million, far above what was actually imposed. The Commission acts within its discretion in imposing administrative penalties within the applicable limits. *Cf. State v. Small,* 105 Ariz. 363, 368, 464 P.2d 955 (1970) ("We cannot say the trial court ... abused its discretion in imposition of the sentence, which is within the statutory minimum and maximum limits."). Nor can we say the penalties were unsupported by

the evidence or arbitrarily or capriciously imposed.

## II. Restitution

¶ 36 At the time Radical Bunny stopped the RB–ML Loan Program and the Division brought the enforcement action, the Radical Bunny participants, excluding Appellants, had an outstanding loan principal of $189,800,867. Accordingly, the Commission ordered Appellants to provide restitution in that amount to "repay the nonmanager Participants the principal amount of their investment."

¶ 37 The Commission's authority to order restitution arises from A.R.S. § 44–2032(1), which provides in pertinent part:

If it appears to the commission, either on complaint or otherwise, that any person has engaged in, is engaging in or is about to engage in any act, practice or transaction that constitutes a violation of [Title 44, chapter 12], or any rule or order of the commission under this chapter, the commission, in its discretion may:

1. Issue an order directing such person ... to take appropriate affirmative action within a reasonable period of time, as prescribed by the commission, to correct the conditions resulting from the act, practice or transaction including, without limitation, a requirement to provide restitution as prescribed by rules of the commission.

As authorized by A.R.S. § 44–2032(1), the Commission promulgated Arizona Administrative Code (A.A.C.) R14–4–308(C)(*l* ), which establishes a formula for determining the amount of restitution when ordered, which states:

If restitution is ordered by the Commission, [t]he amount payable as damages to each purchaser shall include:

a. Cash equal to the fair market value of the consideration paid, determined as of the date such payment was originally paid by the buyer; together with

b. Interest at a rate pursuant to A.R.S. § 44–1201 for the period from the date

---

8. Of this amount, $2 million was assessed for Hirsch's involvement with Radical Bunny and $150,000 for his involvement with Horizon.

of the purchase payment to the date of repayment; less

c. The amount of any principal, interest, or other distributions received on the security for the period from the date of purchase payment to the date of repayment.

¶ 38 Appellants do not cite or discuss this formula but argue by implication it is invalid because "[w]hen the legislature used the word restitution [in A.R.S. § 44–2032(1)], it imposed the existing case law defining [ ] restitution," which they contend is limited to profit personally received by Appellants, rather than the investors' loss. We review issues of statutory construction *de novo*, giving words their ordinary meaning unless the context of the statute requires otherwise. *Canon Sch. Dist. No. 50 v. W.E.S. Constr. Co., Inc.*, 177 Ariz. 526, 529, 869 P.2d 500 (1994) (citing *Bd. of Supervisors v. Pratt*, 47 Ariz. 536, 542–43, 57 P.2d 1220 (1936)).

¶ 39 The plain language of A.R.S. § 44–2032 grants the Commission authority to order actions to "correct the conditions resulting from" the violation of the ASA "including, without limitation, a requirement to provide restitution." Nothing in A.R.S. § 44–2032 limits the amount of restitution that can be ordered to the benefits "pocketed" by the wrongdoer; on the contrary, the statute specifically states the relief is "without limitation," and grants the Commission abundant discretion in fashioning a remedy that may "include" restitution—but not to the exclusion of any other type of relief appropriate to "correct" the results of the violations. *See State v. Leonardo*, 226 Ariz. 593, 595, 250 P.3d 1222 (App.2011) ("The use of the word 'including' denotes the list is illustrative and not exclusive.") (citing *Prince & Princess Enters., L.L.C. v. State ex rel. Ariz. Dep't of Health Servs.*, 221 Ariz. 5, 8, ¶ 13, 209 P.3d 141 (App.2008)). Notably, the language of both A.R.S. § 44–2032 and A.A.C. R14–4–308 has remained unchanged for at least thirty years, despite sweeping revisions to other areas of the ASA, negating any suggestion the legislature had concerns regarding the Commission's definition of restitution.

¶ 40 Moreover, the Commission's interpretation is consistent with both the ordinary meaning of restitution, which focuses on restoring the victim to a prior position, *see Hughey v. United States*, 495 U.S. 411, 416, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990) ("[T]he ordinary meaning of 'restitution' is restoring someone to a position he occupied before a particular event."), and the stated intent of the ASA as a remedial measure that should be liberally construed for the protection of the public, *Grand*, 225 Ariz. at 174, ¶ 16, 236 P.3d 398 (quoting 1951 Ariz. Sess. Laws, ch. 18, § 20 (1st Reg.Sess.)). Thus, the Commission's formula for restitution addressing the loss to the investor, rather than the—in this case much more limited—profits earned by the violator, is consistent with the plain language of A.R.S. § 44–2032(1).

¶ 41 Appellants argue we must construe A.R.S. § 44–2032(1) in conformance with federal law, but do not cite a federal provision substantially similar to A.R.S. § 44–2032. Such a statute arguably exists in 15 U.S.C. § 78u–2(e), which grants the SEC "[a]uthority to enter an order requiring an accounting and disgorgement" against a person who commits a securities violation. However, the terms restitution and disgorgement, while similar, are different and have different purposes. As the federal courts have routinely found, "disgorgement is not precisely restitution. Disgorgement wrests ill-gotten gains from the hands of a wrongdoer ... and is meant to prevent the wrongdoer from enriching himself by his wrongs. Disgorgement does not aim to compensate the victims of the wrongful acts, as restitution does." *SEC v. Huffman*, 996 F.2d 800, 802 (5th Cir.1993) (citations omitted); *see also SEC v. Fischbach Corp.*, 133 F.3d 170, 175–76 (2d Cir.1997). That federal securities laws specify a different remedy than that provided for under Arizona law gives us "good reason to depart from that authority." *Sell v. Gama*, 231 Ariz. 323, 327, ¶ 18, 295 P.3d 421 (2013) (noting federal law is persuasive in interpretation of Arizona securities laws only where provisions and underlying policies are similar) (citing *State v. Gunni-*

*son,* 127 Ariz. 110, 112–13, 618 P.2d 604 (1980)).[9]

¶ 42 The Commission promulgated rules to define the remedy available in actions for enforcement of securities violations. Appellants do not dispute that the Commission applied those rules correctly, and the record reflects that the restitution amount was appropriate. *Cf. Clay v. Ariz. Interscholastic Assoc., Inc.,* 161 Ariz. 474, 476, 779 P.2d 349 (1989) ("[A]n agency must follow its own rules and regulations; to do otherwise is unlawful."); *see also Gibbons v. Ariz. Corp. Comm'n,* 95 Ariz. 343, 347, 390 P.2d 582 (1964) (determining decision of Commission was void where it failed to comply with its own rules and regulations concerning notice to interested parties). Accordingly, the Commission did not abuse its discretion or act in an arbitrary or capricious fashion by ordering Appellants pay restitution in the amount of $189,800,867. *See Grand,* 214 Ariz. at 23, 147 P.3d 763 ("[W]e see no injustice in requiring a defendant to return the consideration an unwitting purchaser paid for any securities sold during the course of [a fraudulent] scheme.")

## CONCLUSION

¶ 43 We affirm the superior court's order upholding the Commission's order levying administrative penalties and imposing restitution upon Appellants.

¶ 44 Appellants request their attorneys' fees on appeal. Because Appellants are not the prevailing party, we deny their request. However, as the prevailing party, the Commission is entitled to its costs on appeal, subject to compliance with ARCAP 21(b).

9. For this reason, we reject Appellants' argument that we must adopt the penalty imposed by the United States District Court for the District of Arizona in separate proceedings against Appellants for violations of federal securities laws.