NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

VENTURES 7000, LLC, et al., *Plaintiffs/Appellants,*

*v.*

ARIZONA CORPORATION COMMISSION, *Defendant/Appellee*

No. 1 CA-CV 21-0179
FILED 2-3-2022

---

Appeal from the Superior Court in Maricopa County
No. LC2020-000093-001
The Honorable Daniel J. Kiley, Judge

**AFFIRMED**

---

COUNSEL

Weiss Brown, Scottsdale
By Alan Baskin, Caroline Saunders
*Counsel for Plaintiffs/Appellants*

Arizona Corporation Commission, Securities Division, Phoenix
By James D. Burgess
*Counsel for Defendant/Appellee*

-------------------------

## MEMORANDUM DECISION

Presiding Judge Paul J. McMurdie delivered the Court's decision, in which Vice Chief Judge David B. Gass and Judge Angela K. Paton joined.

-------------------------

**M c M U R D I E**, Judge:

**¶1**         Vernon Twyman and Ventures 7000, LLC, ("Ventures") appeal from the superior court's judgment affirming the Arizona Corporation Commission's order finding Twyman and Ventures liable for unregistered securities sales by unregistered dealers or salespersons and fraud in the purchase or sale of securities. We find no reversible error and affirm.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**         In February 2016, the Arizona Corporation Commission Securities Division[1] issued a temporary order to cease and desist against Twyman and Ventures after learning that several investors had been misled into funding Twyman's purported business operations. Investors explained they were solicited for funds to finance projects to recover a stash of priceless lead forgotten for centuries beneath a catholic church in Central America and gold hidden in the Philippines by Japanese soldiers during World War II. In February 2020, after a lengthy hearing before the Commission's Hearing Division,[2] the Commission found Twyman and Ventures liable for material misrepresentations and omissions made by Ventures in connection with an offer or sale of securities. Twyman and Ventures were also found responsible for inducing and participating in unlawful sales made by Ventures' joint partner, the Fortitude Foundation

-------------------------

[1]     *See* A.R.S. §§ 44-1811, -1813; Ariz. Admin. Code (A.A.C.) §§ R14-3-109(G), R14-4-304 (securities division conducts investigations and prosecutes enforcement actions on behalf of the Commission).

[2]     *See* A.R.S. § 44-1973(A); A.A.C. §§ R14-3-102(G), -109(A) (hearing officer authorized by the Commission may preside over enforcement hearings).

("Fortitude"). The Commission ordered Twyman and Ventures to pay more than $744,000 in restitution.

¶3            Twyman and Ventures sought review of the Commission's order from the superior court, arguing the evidence did not support the Commission's findings, and they were denied due process because the hearing violated their right to a jury trial and the Commission allowed a victim investor to testify without being subject to cross-examination. Viewing the facts in the light most favorable to affirming the Commission's decision, the superior court affirmed the order. It concluded that the Commission's findings were supported by substantial evidence, Twyman and Ventures were not entitled to a jury trial, and the investor's statement did not violate Twyman's or Ventures' due process rights.

¶4            Twyman appealed to this court. We, too, view the facts in the light most favorable to upholding the Commission's decision. *Hirsch v. Arizona Corp. Comm'n*, 237 Ariz. 456, 459, ¶ 1, n.2 (App. 2015). We have jurisdiction under A.R.S. §§ 12-2101(A)(1) and 12-120.21(A)(1).

### Facts before the Commission

¶5            As he tells it, Twyman has spent much of his life zealously hunting Japanese treasure hidden in the Philippines. From several unnamed contacts, Twyman claims to have received information verifying the presence of gold and other valuables hidden or discarded at specific locations in the Philippines during World War II.

¶6            Twyman testified that he first learned of the rumored Japanese gold while working at a financial planning seminar in 1985. He noticed that some attendees he was advising had marked on their balance sheet something called a "Philippine gold investment." Twyman recounted that he doubted the investment and recorded the investment's value at $0, agitating the man who had solicited the investments. The man later came to the seminar and accused Twyman of telling the investors they had been scammed. Twyman claimed the man hired him to perform due diligence on the investment. After four months, Twyman said he believed the Japanese war treasure was real and a recovery project viable. Twyman explained he then began to recover the gold in the Philippines. He testified that he was "involved at a very high level" and reported to some unnamed individual in Washington, D.C.

¶7          In the 1980s, Twyman took a break from the treasure hunt after he came to believe it was endangering his life.[3] During this break, he became the president of BeneFund. This corporation was ultimately the subject of an enforcement action brought by the Securities and Exchange Commission in the United States District Court for the Northern District of Oklahoma. The SEC alleged that Twyman engaged in a fraudulent scheme to promote and distribute BeneFund securities. Sec. & Exch. Comm'n, Litigation Release No. 15364, (May 13, 1997).[4] The SEC alleged, in connection with the offer and sale of unregistered BeneFund securities, Twyman misrepresented that BeneFund stock would be listed on the Nasdaq stock exchange within 60 to 90 days and investment funds would be used for a marketing campaign expected to boost BeneFund's annual revenue to nearly $50 million. *Id.* As a result of the SEC action, Twyman consented to a judgment issued by the District Court which enjoined him from future violations of the antifraud and registration provisions of federal securities laws, barred him from serving as an officer or director of a publicly traded company, and ordered disgorgement of $277,000.[5]

¶8          Twyman testified that he eventually returned to the Philippines to continue to search for gold. He explained that his focus shifted to another venture when progress on the gold-recovery project slowed during the rainy season. He claimed to have received a tip that a South American priest could give him access to underground caverns containing a stash of priceless lead, which could be sold for a quick profit because its unique composition made it useful in electronic-component manufacturing.

¶9          In early 2012, Twyman was introduced to Robert Moss, Jeffrey McHatton, and Robert Sproat by a mutual friend, a pastor who

---

[3]       Twyman testified that a former president of the Philippines sent men to kill him because he was assisting the president's successor in recovering treasure. Twyman reported having been the victim of an intentional dioxin poisoning during this period, although it is unclear whether Twyman was claiming that there were two attempts on his life or that the president's men poisoned him with dioxin.

[4]       We take judicial notice of the SEC's litigation release to establish the allegations' existence but not their veracity.

[5]       The SEC waived disgorgement based on Twyman's demonstrated inability to pay.

believed they shared the same vision and objectives. Moss, McHatton, and Sproat represented Fortitude, a 501(c)(3) nonprofit corporation seeking investment opportunities. They characterized Fortitude as a non-profit run by "three men of God who were called with a Divine purpose to help heal the needy, and in doing so bring salvation to their hearts for the Kingdom of God." The men met at leadership conferences and, once acquainted, soon conceived the idea for an organization that would make charitable donations using investment proceeds. Fortitude distributed promotional materials stating its charter required 90% of its net earned income to further philanthropic efforts. Still, at the time of the hearing, it did not produce a charter or any records of charitable contributions. Fortitude had, however, distributed funds to Moss, McHatton, and Sproat, which were used to pay for living and other personal expenses, including payments towards Moss's home loan and his daughter's tuition, and Sproat and McHatton's home rental payments.

¶10 After speaking with Moss, McHatton, and Sproat, Twyman provided them with a financing proposal summary he prepared explaining the history of the gold-recovery project, its status, and the need for capital funding. The proposal asserted that (1) several business entities controlled by Twyman had spent considerable time and money over the previous ten years investigating potential treasure sites in the Philippines, (2) efforts at two confirmed sites were "poised for completion," (3) gold had been "visually confirmed" at one of the sites, (4) the operation to recover 20 metric tons of gold bullion at that site would take less than six weeks, and (5) the investors' projected returns on the projects would be "substantial, potentially exceeding 100 to 1."

¶11 Twyman also told Moss, McHatton, and Sproat about his plan to buy and sell the lead in Central America. Twyman reported he knew the location of a large supply of specially-composed lead that could be purchased for less than $10 per pound and sold for more than $1100 per pound to companies like IBM and Qualcomm, which had a high demand for the lead because of a shortage.

¶12 Moss, McHatton, and Sproat expressed an interest in forming a joint venture partnership and funding Twyman's projects with the proceeds from a recent transaction, expected to total $100 million. Moss later testified that Fortitude used $110,000 of an investor's money to purchase what they believed was a Brazilian government-issued bond worth $100 million in a sale brokered by a woman purportedly working for both the United Nations and an investment company domiciled in the Bahamas. When the Brazilian-bond deal fell through, they decided to fund

Twyman's projects by seeking investments from their "sphere of influence."

¶13　　　In April 2012, Twyman sent Fortitude an email detailing his past legal difficulties after Fortitude learned about what he characterized as "largely incomplete and erroneous" information about him available on the internet. His email explained he realized "some of [Fortitude's] prospective investors" may also choose to undertake their due diligence, so he believed it prudent to "mitigate any possible misunderstanding by providing a totally candid and transparent rendering of the facts." The email provided explanations and context for several past issues, including the SEC judgment arising out of Twyman's involvement with BeneFund, a judgment against Twyman in the mid-1980s for a breach of fiduciary duty involving the embezzlement of $150,000, and a civil action against Wycliffe to recover some of the $850,000 Wycliffe received as proceeds of a Ponzi scheme after he invested over $2.3 million from clients, friends, and relatives.

¶14　　　In May 2012, Fortitude entered a joint venture funding agreement with Twyman's business entities.[6] Fortitude agreed to fund the projects with $14 million borrowed from investors in exchange for a portion of the future revenue of the gold- and lead-recovery projects. In June 2012, shortly after asking Twyman to provide a financing proposal detailing how Ventures would use a $250,000 investment, Fortitude received $250,000 from Timothy Brunt.

¶15　　　Brunt testified that he read the financing proposal before deciding to invest, including projections that an investment of $250,000 would lead to a return of $11 million. He was encouraged by the proposal's anticipated timeline for a return on his investment. The proposal offered "both near and long-term returns to those financiers willing to undertake the challenge." It created a sense of urgency by providing a "special bonus pool" that would pay "an additional cash bonus" to the purchasers of the next five revenue-sharing units. And the proposal stated that 20 metric tons of gold bullion had been located in the Philippine Sea under just 300 feet of water. It revealed the "coordinates [were] exclusively in the hands of

---

[6]　　　Twyman conducted his business through Wycliffe Trust, for which he was the sole managing trustee and a beneficial owner, and through Ventures, an Oklahoma limited liability company managed by Twyman and wholly owned by Wycliffe Trust.

Ventures," and the added funding would allow Ventures to recover the gold within six weeks.

**¶16** Brunt was directed to wire the funds to a bank account controlled by McHatton. McHatton then transferred $225,000 to a bank account controlled by Twyman and $7500 to a bank account controlled by Moss.

**¶17** In October 2012, Dr. Matt Mannino, the speaker who led the leadership seminars where McHatton, Moss, and Sproat first met, invested $75,000 with Fortitude to be used in Ventures' lead-recovery project. Mannino received an email from Moss inviting him to participate in a webinar about an opportunity to invest in the project. The email represented that Fortitude had invested $250,000 of its capital into Ventures' earlier fundraising round and was now "lead[ing] the charge" by investing $125,000 in this latest lead-recovery opportunity. Webinar attendees were presented with information Twyman provided outlining the project.[7] Attendees were informed that an ample supply of 200- to 500-year-old lead had been discovered "in a specific and proprietary location."[8] They were told they could expect a 500% return on their investment within 90 to 120 days and that they needed to act quickly to participate in the opportunity. Expressions of interest were due by the close of business that week, and funds had to be wired by the end of October.

**¶18** On October 31, Mannino wired the money to a bank account controlled by McHatton. Brunt made another investment of $125,000 around the same time. Shortly after the two investments, McHatton transferred $170,000 of the $200,000 to a bank account controlled by Twyman.

**¶19** In November 2012, Lowell Olmstead invested $100,000 in the lead project. In late October, Olmstead also received an email from Moss about the lead-recovery investment opportunity. Moss provided Olmstead with documents explaining the project, the capital needed, the low risks

---

[7] Moss testified that Twyman prepared the slides presented during the webinar.

[8] A slide from the webinar states that "ERA" had located the lead. Twyman testified that ERA was the Environmental Reclamation Authority Limited, an entity he was incorporating to manage the lead-recovery project.

involved, and the anticipated returns. Like he had told Mannino, he told Olmstead that Fortitude had invested $250,000 with Twyman's organizations and that Fortitude was investing $125,000 in the current opportunity. Olmstead testified that he would not have invested if Fortitude had not invested its own money.

¶20 Between November 20 and December 19, 2012, James Clark, John Bruner, and Thomas Spencer invested in the lead-recovery project. Clark and Spencer invested $50,000, and Bruner invested $100,000. Moss approached Clark, Bruner, and Spencer about the opportunity and told them specific project details Twyman had provided, including that the lead was valuable because of its composition and usefulness in computer manufacturing. They were also forwarded a document from Twyman, which represented that "one of the world's foremost experts on the subject . . . placed the market value of the lead at $1,100 to $4,400 per pound." They were also told there was no risk in the investment, and the returns were expected within three to six months, projected at 500%.

¶21 The Hearing Division heard testimony that Twyman led a team on a failed expedition to Guatemala to recover the lead after receiving the investments. Twyman testified that his team included a consultant who attended the trip at Fortitude's request, a metallurgist who could verify the quality of the lead, a former SEAL Team 6 officer, and Twyman's contact who had told him about the opportunity. One team member testified that the trip was disorganized and unfocused.

¶22 Twyman had first planned the trip for Panama but testified that, at the last minute, his contact revealed that the lead was instead in Guatemala. Twyman explained that his contact had misled him about the whole deal. He testified that he could not meet with the priest to access the underground caverns where the lead was stored after he arrived in Guatemala. He said his contact got on a plane and flew out of the country when confronted.

¶23 After the failed expedition, Fortitude solicited the investors in the lead-recovery project to roll their investments into the gold-recovery project. Moss emailed the investors with an attachment written by Fortitude titled "additional opportunity." After apologizing for the delayed return of principal and profits, Fortitude offered the investors the opportunity to convert their investment in the lead-recovery project to the gold-recovery project at no extra cost. The proposal explained:

[D]ue to the delay and in concert with several requests from our lenders for involvement in some of our other project(s), we would like to grant you a great opportunity to join us, and participate right along-side of us, as a financial partner in this additional project, without having to commit any additional financial resources to this secondary project. We are more interested in what we can do "for" you, than what we can obtain "from" you.

As stated, we truly appreciate your patience, cooperation and joint vision. This is <u>not</u> a pitch for more money, as some might expect. We ALL know that the [lead] project is taking longer than expected, and as you may have experienced, sometimes these kinds of delays occur in projects of this nature, especially, in these un-certain and somewhat turbulent economic times.

¶24 Twyman testified he was unsure how many investors in the lead project rolled their money over to the gold-recovery project, but he did not need to keep track because the money was pooled and used for both. He said they were no longer actively pursuing the lead recovery but remained vigilant for antique lead during their sea recoveries in the gold project.

¶25 In 2015, Ventures produced a "news brief" updating investors on the state of the project and soliciting additional investments. More than three years after Ventures' $250,000 financing proposal, the update asserted that "the difficult work of locating and confirming the treasures has already been accomplished" and two separate treasure sites were "now ready to move into the recovery stage." It also declared, "We are exceedingly pleased to announce the shifting of focus in our Philippine operations from [the] Discovery (and Exploration) Phase to the Recovery Phase."

¶26 The news brief contained a solicitation:

As we finally move into the final recovery stage, *there will be a small window of opportunity for existing partners to increase their investment position by purchasing additional revenue sharing units at a reduced rate* and thereby increase their distribution payout. (For further information please call (539) 777-[XXXX]) Additionally, in the future there will be a number of exciting investment opportunities offered exclusively to Ventures

7000 via reputable banking and financial institutions. Some of these opportunities are already being arranged.

¶27 The update proclaimed, "Finally, we are poised on the threshold of achieving all that we have so diligently pursued! In fact, our prospects for phenomenal success have never been greater nor more tangible than they are today!" But at the time of the hearing, the gold- and lead-recovery projects had not yet produced any income or profit.

## DISCUSSION

¶28 On appeal from a superior court's review of an administrative decision, we determine whether the administrative action was illegal, arbitrary, capricious, or involved an abuse of discretion. *Hirsch v. Ariz. Corp. Comm'n*, 237 Ariz. 456, 461–62, ¶ 18 (App. 2015). We will affirm a decision supported by substantial evidence. *Wales v. Ariz. Corp. Comm'n*, 249 Ariz. 263, 268, ¶ 19 (App. 2020).

## A. Substantial Evidence Supports the Commission's Findings that Twyman and Ventures Induced and Participated in Unlawful Sales to Investors.

¶29 Under the Arizona Securities Act, it is unlawful to sell or offer unregistered securities for sale. A.R.S. § 44-1841(A). And a dealer or salesman of securities must be registered to sell or purchase or offer to sell or buy any securities. A.R.S. § 44-1842(A). The Act also provides:

> It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, . . . directly or indirectly to do any of the following:
>
> (1) Employ any device, scheme or artifice to defraud.
>
> (2) Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.
>
> (3) Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

A.R.S. § 44-1991(A). Our supreme court has explained that "the legislature intended the [Arizona Securities Act] 'as a remedial measure' for the 'protection of the public' and therefore specified that the act be 'liberally construed.'" *Grand v. Nacchio*, 225 Ariz. 171, 174, ¶ 16 (2010) (citing 1951 Ariz. Sess. Laws, ch. 18, § 20 (1st Reg. Sess.)). In addition, "[t]he language of the Act confirms a broad intent to sanction wrongdoing in connection with the purchase or sale of securities." *Id.*

¶30 The Commission may bring enforcement actions for violating these sections against "any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase." A.R.S. § 44-2003(A); *see also* A.R.S. § 44-2032. Our supreme court has recognized the sweeping authority granted by A.R.S. § 44-2003(A), which provides a single narrow exception for those who have acted only in the ordinary course of their professional capacity in connection with the sale or purchase. *Grand*, 225 Ariz. at 174, ¶¶ 17–18.

¶31 After proceedings spanning several months, the hearing officer issued a recommended opinion and order. The Commission adopted the opinion and order with only minor changes.[9] The Commission found that Fortitude and its principals were unregistered securities dealers, had sold unregistered securities, and had violated A.R.S. § 44-1991(A) by, *inter alia*, failing to disclose to investors Twyman's SEC judgment and giving investors unrealistic projections of when and in what amount they would receive investment returns. The Commission also found Twyman and Ventures had participated in and induced Fortitude's unlawful sales to six investors. Concerning Twyman, the Commission found:

> Although Mr. Twyman did not meet any of the investors in the [gold and lead projects] except for Mr. Brunt, Mr. Twyman and [Ventures] prepared and provided the informational materials to [Fortitude] that [Fortitude] then used to solicit investors in those Projects. The information included by Mr. Twyman and [Ventures] in the materials contained historic and scientific details that [Fortitude] likely could not have adequately conveyed to investors to induce the sale of the securities. Further, [Ventures'] activities were not

---

9   *See* A.A.C. § R14-3-110 ("A proceeding is submitted for decision by the Commission after taking of evidence, the filing of briefs or the presentation of oral argument as may have been prescribed by the presiding officer.").

"tangential" or "collateral" to [Fortitude's] unlawful securities sales—they were the central purpose of the sales. We agree with the Division that the Projects' completion and investment return projections were misleading, and that failure to include information regarding the prior securities orders and the lack of success after Mr. Brunt's $250,000 investment, were material omissions.

¶32 On appeal, Twyman and Ventures argue that they did not participate in or induce the sales. We disagree. Substantial evidence supports the Commission's finding that Twyman and Ventures participated in and induced the fraudulent sales.

¶33 We agree with the superior court and the Commission that Twyman and Ventures induced unlawful sales. "Induce" is not statutorily defined, but we have interpreted the term narrowly to avoid "sweep[ing] within the statute any outsider to a securities transaction—no matter how remote from the transaction—who provided information that foreseeably contributed to, and thereby influenced, a buyer or seller's decision to engage in the transaction." *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 21 (App. 1996) (as amended). But Twyman and Ventures are not outsiders. Twyman and Ventures were the source of much of the misleading information Fortitude relayed to victims to persuade them to invest. The Commission expressly found that Ventures' timelines and return projections later given to investors were misleading.

¶34 We also conclude that there is substantial evidence that Twyman and Ventures participated in the unlawful sales. Participation requires more than taking tangential action related to an ongoing sale. *Standard Chartered PLC*, 190 Ariz. at 21. But, as noted by the Commission, Twyman and Ventures' activities were not tangential to Fortitude's unlawful securities sales. They were instead the central purpose and basis for the sales. By authoring investment proposals with language directed at investors and receiving the money from those investments to operate a business, Twyman and Ventures participated in the unlawful sales used to fund their projects.

**B.** **Substantial Evidence Supports the Commission's Finding that Ventures Directly Violated A.R.S. § 44-1991(A)(2) and that, as a Controlling Person of Ventures, Twyman Is Jointly Liable for the Violation.**

¶35 The Commission found that, along with inducing and participating in the unlawful securities sales made by Fortitude, Ventures directly violated A.R.S. § 44-1991(A)(2) by making misrepresentations and omitting material facts in the $250,000 financing proposal.

¶36 Twyman and Ventures argue that Ventures did not make a material misrepresentation or omission in connection with the offer or sale of the securities because the alleged misrepresentations were made after the investments were already obtained. They assert that Moss delivered Ventures' $250,000 financing proposal several months after Brunt invested without cogent citations to the record. But Brunt testified that he read Ventures' $250,000 funding proposal before investing. When evidence conflicts, the trier of fact determines which evidence to accept as accurate. *Fairway Builders, Inc. v. Malouf Towers Rental Co.*, 124 Ariz. 242, 250 (App. 1979).

¶37 The Division presented sufficient evidence for the Commission to conclude that Twyman knew that the proposal would be provided to prospective investors. Twyman testified that Brunt was present at the meetings that led to the joint venture between Wycliffe and Fortitude and that he considered Brunt part of the organization. Substantial evidence supports the Commission's finding that Ventures violated A.R.S. § 44-1991(A)(2) by making material misrepresentations in the $250,000 financing proposal that was read by a victim investor shortly before he invested.

¶38 Twyman and Ventures also challenge the Commission's finding that the 2015 news brief contained material misrepresentations and omissions that violate A.R.S. § 44-1991(A)(2). They argue that the news brief was confidential and did not lead to more investments. But the news brief stated that there was a small window for existing partners to increase their investments and provided a phone number for inquiries. And though no investments were made in response to the solicitation, A.R.S. § 44-1991(A)(2) prohibits misrepresentations made in connection with an offer or sale even where no sale is made.

¶39 Twyman also argues that he acted in good faith, did not directly or indirectly induce Ventures' conduct, and is therefore not liable as a control person for Ventures' violations. Under A.R.S. § 44-1999(B),

> [e]very person who, directly or indirectly, controls any person liable for a violation of § 44-1991 or 44-1992 is liable jointly and severally with and to the same extent as the controlled person to any person to whom the controlled person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act underlying the action.

The burden to prove a good faith defense under A.R.S. § 44-1999(B) falls upon the controlling person. *E. Vanguard Forex, Ltd. v. Ariz. Corp. Comm'n*, 206 Ariz. 399, 413, ¶ 46 (App. 2003). The Commission found that Twyman failed to satisfy this burden because "he presented no evidence that he took any steps to 'maintain and enforce a reasonable and proper system or supervision and internal control.'"

¶40 On appeal, Twyman challenges this finding by asserting that Ventures' Director of Investor Relations sent the 2015 news brief without Twyman's authorization. Much like when he made the same argument below, he provides no evidence to support this claim, and consequently, he fails to meet his burden.

**C.** **The Commission Did Not Violate Twyman's and Ventures' Due Process Rights by Allowing a Victim Investor to Make Statements Not Subject to Cross-examination at an Open Meeting.**

¶41 Twyman and Ventures also argue that the Commission denied them due process by permitting Brunt to make unsworn statements at an open meeting without cross-examination.

¶42 Twyman and Ventures called victim-investor Brunt as their witness during the evidentiary portion of the administrative hearing. At the hearing, Brunt testified that he did not want restitution and preferred to keep his investment in the gold-recovery project. Later, Brunt applied for leave to intervene to correct his testimony, asserting that after the hearing he believed Moss and McHatton had misled him and made misrepresentations about the nature of particular investments. The hearing officer granted the request "for the limited purpose of allowing [Brunt] to be included in any award of restitution." Twyman and Ventures did not respond or object to Brunt's application.

**¶43**　　　The Commission held an open meeting to consider whether to adopt the recommended opinion and order prepared by the hearing officer. At the open meeting, the Commission heard statements from the Hearing Division, the Securities Division, Moss, McHatton, and counsel for Twyman and Ventures. Brunt also requested to speak, and Twyman and Ventures opposed his request.

**¶44**　　　The Securities Division suggested allowing Brunt the opportunity to speak as a public member so long as the Commission understood that the evidentiary hearing had closed, Brunt's statement was not under oath, was not testimony, and would not constitute evidence. The Commission agreed and allowed Brunt to speak during public comment. In addition, McHatton's spouse and an uninvolved citizen also spoke during the time for public comment. In his statement, Brunt summarized some of the testimony presented at the evidentiary hearing, explained how his losses had placed him in a position of financial insecurity, and accused Moss and McHatton of being dishonest and lacking integrity, asserting that he had proof of misrepresentations made by Moss.

**¶45**　　　Due process requires notice and an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Wales*, 249 Ariz. at 267, ¶ 9 (quoting *Comeau v. Ariz. State Bd. Of Dental Exam'rs*, 196 Ariz. 102, 107–08, ¶ 20 (App. 1999). And "[t]he right to cross-examination is fundamental and attaches when . . . any testamentary or documentary evidence [is received]." *Volk v. Brame*, 235 Ariz. 462, 469, ¶ 24 (App. 2014) (alteration in original) (quoting *Obersteiner v. Indus. Comm'n*, 161 Ariz. 547, 549 (App. 1989).

**¶46**　　　If the facts asserted by Brunt constituted evidence that could be relied on by the Commission, Twyman and Ventures would be entitled to an opportunity to challenge the testimony during cross-examination. But in this case, the Commission could not and did not rely on those facts in deciding to adopt the recommended opinion and order. *See* A.A.C. R14-3-109(F) ("All testimony to be considered by the Commission in formal hearings shall be under oath, except matters of which judicial notice is taken or entered by stipulation."). The Commission allowed Brunt to speak only after agreeing with the Security Division that the statement was not evidence. It is clear from the record that the Commission's adoption of the recommended opinion and order, drafted before the open meeting, was not affected by Brunt's unsworn statement.

**CONCLUSION**

¶**47**      We affirm.



AMY M. WOOD • Clerk of the Court
FILED:   AA